IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BILL RAMIREZ, | ) | 4:04CV3258 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM** |
| vs. | ) | **AND ORDER** |
| | ) | |
| POSTMASTER GENERAL, | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiff, Bill Ramirez, lost his job at the post office after he reported himself to police as being mentally disturbed and potentially dangerous. Ramirez claims First Amendment protection and also alleges that he was terminated because he is Hispanic and because he filed an EEO complaint of discrimination. Ramirez alleges that during his employment he was harassed by a co-worker and subjected to disparate treatment. The Postmaster General has moved for summary judgment, which will be granted.

## I. INTRODUCTION

It appears from the parties' briefs that the following facts are undisputed:[1]

---

[1] Our local rules require the moving party to "set forth in the brief in support of the motion for summary judgment a separate statement of material facts as to which the moving party contends there is no genuine issue to be tried and that entitle the moving party to judgment as a matter of law." NECivR 56.1(a)(1). The opposing party must "include in its brief a concise response to the moving party's statement of material facts[,] . . . address[ing] each numbered paragraph in the movant's statement and, in the case of any disagreement, . . . [providing] pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies." NECivR 56.1(b)(1). "Properly

1. Ramirez was employed by the United States Postal Service at its main post office in Lincoln, Nebraska, beginning in about November 1997.

2. He worked as an automation clerk.

3. Ramirez was considered a competent worker.

4. The Postal Service has a "Zero Tolerance Policy" regarding violence in the work place.[2]

5. On or about January 17, 1998, Ramirez was placed on emergency off-duty suspension.

6. Ramirez received a suspension without pay for this incident.

7. Ramirez did not file an EEO complaint at the time concerning this incident.

8. Beginning in about February 2001, Plaintiff had difficulties with a co-worker, Susan Ritterbush.

9. Ramirez and Ritterbush were fellow employees and she had no supervisory authority over him.

10. In about April 2001, Ramirez was involved in an altercation with a motorist while off-duty.[3]

11. As a result of this incident, Ramirez attended anger management classes on a weekly basis.

12. On or about May 7, 2001, Ramirez defaced a Postal Service poster regarding safety and security by writing next to the admonition that employees were to wear their ID badges at all times "except Sue Ritterbush."

13. Ramirez was recommended for discipline for this action.

14. Ramirez continued to make complaints concerning Ritterbush's conduct regarding her ID badge.

---

referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response." Id.

[2] Ramirez denies, however, that the policy was always enforced or was enforced uniformly.

[3] Ramirez denies that this off-duty incident is material.

2

15. Ramirez states that he was friendly with all other employees and that only Ritterbush was antagonistic toward him.

16. On August 23, 2001, at about 6:30 p.m., while on the way to a safety meeting, Ramirez snapped a rubber band against a female employee.

17. Later that evening, the acting manager asked to see Ramirez in her office, where she attempted to discuss the rubber band incident with him.

18. Ramirez left her office and returned to the work floor.

19. Ramirez promptly questioned Ritterbush about why she had reported the rubber band incident.

20. Another co-worker, Jonathan Nguyen, separated Ramirez and Ritterbush.

21. The acting manager again sought to speak to Ramirez that evening concerning his conduct, and placed him on emergency off-duty suspension.

22. Ramirez left her office in anger and slammed his fist into a locker before leaving the post office.

23. Ramirez went home and "handled a firearm."

24. Ramirez then went to the Lincoln Police Department where he told the police that he had guns in his home and that he did not want to hurt anyone.

25. Ramirez was admitted to a treatment center that night.

26. On September 4, 2001, staff at the Community Mental Health Center of Lancaster County prepared and sent four letters to Postal Service employees. Each letter said, in substance, that Ramirez had disclosed "thoughts of harming" the employee.

27. The letters went on to state that "As of this date Mr. Ramirez appears to be stable and appears to have no intention of causing you physical harm." The letters also stated, "Although Mr. Ramirez presently voices no further intention of causing physical harm to you, the potential risk does remain and precautions should be taken."

28. Carl Bogues, the deciding official in this matter, had never seen such letters prior to this incident.

29. On or about November 9, 2001, Ramirez submitted an EEO Complaint of Discrimination in the Postal Service, Case No. 1I-681-0067-01, alleging that since

January 1998 he had been subjected to discrimination based on his race (Hispanic), sex (male), and age (49).

30. On November 21, 2001, James Troidl, Manager of Distribution Operations at the Lincoln main post office, prepared a Notice of Proposed Removal, which was provided to Ramirez on November 27, 2001.

31. On December 5, 2001, the EEO Dispute Resolution Specialist issued his inquiry report for Case 1I-681-0067-01, stating that "No resolution was reached."

32. On January 7, 2002, Carl Bogues, Plant Manager for the Lincoln facility, issued a Letter of Decision terminating Plaintiff from employment with the Postal Service.

33. On or about March 22, 2002, Ramirez submitted an EEO Complaint of Discrimination in Postal Service Case No. 1E-681-0026-02, alleging that his termination on January 7, 2002, was a result of discrimination on the basis of his race and as retaliation for prior protected activity.

34. On March 28, 2002, the EEO Dispute Resolution Specialist issued his inquiry report for Case 1E-681-0026-02, stating that "No resolution was reached."

35. Ramirez has not filed any other EEO complaints.

36. On February 21, 2003, an administrative judge for the Merit Systems Protection Board denied Ramirez's appeal of his dismissal.

37. On June 23, 2004, the full Board denied Ramirez's request for further review (Ramirez v. U.S.P.S., 96 M.S.P.R. 465 (June 23, 2004)).

38. Ramirez filed his Complaint in this matter on July 28, 2004.

Ramirez alleges, first of all, that the Postal Service violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., "in that Defendant discriminated against the Plaintiff on the basis of his race by disparate [sic] of the treatment afforded him in comparison to Plaintiff's non-Hispanic co-workers and the disparate [sic] of the treatment afforded him in comparison to Plaintiff's non-complaining co-workers." (Complaint (filing 1) ¶ 18.) Ramirez also alleges in three "causes of action" brought under 42 U.S.C. § 1983 that his constitutional rights

4

were violated by two supervisors who have been dismissed from the action.[4] While it is unclear from the language of the complaint whether any of these constitutional claims are alleged against the Postmaster General, the parties have briefed the matter as if all claims apply. Ramirez alleges that his right to free speech under the First Amendment to the United States Constitution was violated "in that the individual Defendants terminated the Plaintiff's employment because of the complaints about discrimination the Plaintiff had previously made and because of statements made by Plaintiff in seeking help for his depression[,]" that the "actions of the individual Defendants constitute a violation of the Plaintiff's rights under the Equal Protection Clause of the First [sic] Amendment to the United States Constitution . . .[,]" and that the "actions of the individual Defendants in depriving Plaintiff of his employment under false pretenses and for illegal, arbitrary and capricious reasons violates Plaintiff's rights to due process as secured to him by the Fourteenth Amendment to the United States Constitution . . .." (Complaint ¶¶ 21, 25, and 28.)

## II. DISCUSSION

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Egan v. Wells Fargo Alarm Servs., 23 F.3d 1444, 1446 (8th Cir.1994). It is not the court's

---

[4] On March 11, 2005, the court entered a memorandum and order granting dismissal pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure. Judgment was also entered pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. Essentially, the court ruled that the supervisors were not subject to suit under Title VII, that Ramirez's constitutional claims were preempted by Title VII to the extent they were based on the same facts, that § 1983 and the Fourteenth Amendment do not apply to USPS officials, and that Ramirez's constitutional claims against these individual defendants were precluded in any event by the grievance procedures in the Postal Reorganization Act, 39 U.S.C. §§ 1001-11 & 1201-09.

5

function to weigh evidence in the summary judgment record to determine the truth of any factual issue. Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." Id. Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. Rule 56(e) therefore requires

6

the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.

### A. Title VII Claims

The Postmaster General erroneously claims that Ramirez's Title VII action is untimely because "any appeal [from the Merit Systems Protection Board] had to be filed no later than 30 calendar days after the date the initial decision became final in accord with 42 U.S.C. § 2000e-16(c)." (Filing 45, p. 12.) Section 2000e-16(c) actually contains a 90-day limitations period,[5] but it does not apply when an appeal of a "mixed case" (i.e., a civil service case that involves a discrimination claim) has been taken to the Merit Systems Protection Board,[6] in which event the applicable statute of limitations is stated in 5 U.S.C. § 7703(2). That statute provides:

> Cases of discrimination subject to the provisions of section 7702[7] of this title shall be filed under section 717(c) of the Civil Rights Act of

---

[5] The statute contained a 30-day limitations period prior to being amended in 1991, see Pub. L. No. 102-166 § 114(a), but it now permits a civil action to be filed "[w]ithin 90 days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection (a) . . .." 42 U.S.C.A. § 2000e-16(c) (West 2003).

[6] When a court action is filed subsequently in a mixed case, the adverse agency action is reviewed on the administrative record, while the discrimination claim is reviewed de novo. See Crawford v. Runyon, 37 F.3d 1338, (8th Cir. 1994). Here, however, Ramirez has not appealed the MSPB's decision affirming his termination; his complaint only alleges discrimination. Accordingly, no administrative record has been filed.

[7] Section 7702 includes a case where an employee who "has been affected by an action which the employee . . . may appeal to the Merit Systems Protection Board, and alleges that a basis for the action was discrimination prohibited by . . . section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16), . . .." 5 U.S.C.A. § 7702(a)(1)(A) and (B)(i) (West 1996).

7

> 1964 (42 U.S.C. 2000e-16(c)), section 15(c) of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 633a(c)), and section 16(b) of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 216(b)), as applicable.  Notwithstanding any other provision of law, any such case filed under any such section must be filed <u>within 30 days after the date the individual filing the case received notice</u> of the judicially reviewable action under such section 7702.

5 U.S.C.A. § 7703(2) (West 1996) (emphasis supplied).

The Postmaster General has failed to present a certified mail receipt or any other evidence to establish when Ramirez received the MSPB's decision.  According to Ramirez, however, the decision was received on June 28, 2004, as evidenced by his handwritten notation on the first page of the decision. (Filing 53, Exhibit 6.)  The complaint in this court was filed 30 days later,[8] on Wednesday, July 28, 2004.  The filing thus appears to be timely.

The Postmaster General also claims that Ramirez failed to exhaust available administrative remedies because he did not consult an EEO counselor within 45 days of the alleged discriminatory act or effective date of the adverse personnel action.[9]

---

[8] "In computing any period of time prescribed or allowed . . . by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the office of the clerk of the district court inaccessible, . . .."  Fed. R. Civ. P. 6(a).  Ramirez also claims the benefit of the 3-day extension provided by Federal Rule of Civil Procedure 6(e), but that rule applies only to "parties" and consistently has been held not to apply to jurisdictional periods for commencing a proceeding in the district court.  See <u>Rouse v. Lee</u>, 339 F.3d 238, 245 (4th Cir. 2003).

[9] "Aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age or handicap must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter."

8

The evidence does not support this claim. To the contrary, the Postmaster General's own documentary evidence shows that Ramirez contacted the EEO counselor (or dispute resolution specialist) within a month after his termination, on February 7, 2002, claiming race discrimination and retaliation. (Filing 46, Exhibit 9 to Ramirez 2005 deposition.) Counseling was concluded without any resolution of the claims on or about March 11, 2002, when Ramirez evidently received notice from the counselor of his right to file an EEO complaint. (Id.) On March 22, 2002, Ramirez promptly filed an EEO complaint.[10]   (Filing 46, Exhibit 5 to Ramirez 2005 deposition.)

The evidence also shows that Ramirez had initiated contact with the EEO counselor on March 19, 2001,[11] and again on August 15, 2001, about a week before the rubber band incident. According to the EEO counselor's report, an inquiry into

---

29 C.F.R. § 1614.105(a). Generally, [a]n aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). The 45-day deadline serves as a statute of limitations and bars a subsequent lawsuit absent a showing of waiver, estoppel or tolling. See Peanick v. Morris, 96 F.3d 316, 321 (8th Cir. 1996). "Only the claims raised in this pre-complaint counseling (or issues or claims like or related to issues or claims raised in the pre-complaint counseling) may be alleged in a subsequent complaint filed with the agency." 29 C.F.R. § 1614.105(b)(1).

[10] "A complaint must be filed within 15 days of receipt of the notice required by § 1614.105(d), (e), or (f) [of the aggrieved person's right to file a discrimination complaint]." 29 C.F.R. § 1614.106(a)(1).

[11] A letter from the district EEO office states that a request for counseling was received on March 19, 2001, but the record contains no other information concerning this request. A copy of the letter is attached to a motion that Ramirez recently filed requesting leave to supplement his evidence. (Filing 61.) That motion will be granted instanter.

the rubber band incident was made.[12]  (Filing 46, Exhibit 8 to Ramirez 2005 deposition.)  The counseling period associated with the August 15, 2001 contact reportedly ended on or about October 20, 2001, without any resolution of claims. (Id.)  An EEO complaint was filed by Ramirez on November 9, 2001.  (Filing 46, Exhibit 1 to Ramirez 2005 deposition.)

The record does not disclose what disposition, if any, was made by the Postmaster General regarding either EEO complaint.[13]  According to the decision that was rendered by the MSPB administrative judge, however, "on August 16, 2002, [Ramirez] petitioned for appeal to the Board seeking review of the agency's decision to remove him."  (Filing 46, Exhibit E.)  The Postmaster General does not contend that the appeal was untimely.[14]

---

[12] The EEO counselor's report indicates that Ramirez complained about continuing discrimination based on race, sex, and age, and, in particular, about the January 17, 1998 suspension, about being harassed by a co-worker in January 2001, and about the August 23, 2001 suspension.

[13] The inquiry reports that were issued by the dispute resolution specialist on December 5, 2001, and March 28, 2002, pertained only to the counseling sessions and did not decide the EEO complaints.

[14] "A comprehensive statutory and regulatory scheme governs the processing of mixed cases. See 5 U.S.C. § 7702; 29 C.F.R. §§ 1613.401-1613.421; 5 C.F.R. §§ 1201.151-1201.175.  A mixed case may be filed as a complaint with the agency's EEO department or as an appeal to the MSPB, but not both.  5 U.S.C. § 7702; 29 C.F.R. § 1613.403.  Either agency is authorized, and required, to address both the discrimination issues and the civil service issues that arise in a mixed case.  5 U.S.C. § 7702(a).  An employee who initially chooses to file an EEO mixed case complaint may, after 120 days have passed without a judicially reviewable action by the agency, appeal the matter to the MSPB, 5 U.S.C. § 7702(e)(2), and transfer the administrative review to that agency.  EEOC regulations provide for the cancellation of a mixed case complaint if such an appeal is timely filed. 29 C.F.R. § 405(b)."  McAdams v. Reno, 64 F.3d 1137, 1141-42 (8th Cir. 1995) (footnotes omitted).

10

It appears from the administrative judge's decision that the appeal was taken only with respect to the termination decision. To the extent Ramirez alleges in the complaint filed in this court—as he also alleged in the November 8, 2001 EEO complaint—that he was subjected to a hostile work environment because of race-based harassment by a co-worker,[15] or that he was subjected to disparate treatment when he was suspended for the rubber band incident, it is questionable whether such claims of racial discrimination were administratively exhausted or timely filed.

Even if all of the Title VII claims alleged in Ramirez's complaint are properly before the court, however, none require submission to a jury. Quite simply, there is no evidence of unlawful conduct by the Postal Service.

To sustain a claim against an employer for a racially hostile work environment, a plaintiff is required to show: (1) he or she is a member of a protected group, (2) he or she was subjected to unwelcome harassment, (3) the harassment was based upon race, (4) the harassment affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the racially discriminatory harassment and failed to take prompt and effective remedial measures to end the harassment. Willis v. Henderson, 262 F.3d 801, 808 (8th Cir. 2001).

There is evidence that Ramirez is Hispanic and that he was harassed by a co-worker, Susan Ritterbush. However, there is absolutely no evidence that Ramirez was harassed by Ritterbush because he is Hispanic. The lack of a causal connection is fatal to this claim.

---

[15] Allegations of a hostile work environment are treated as "a single unlawful employment practice." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002). Only the smallest portion of that "practice" needs to occur within the limitations period for the claim to be timely. Jensen v. Henderson, 315 F.3d 854, 859 (8th Cir. 2002).

11

Ramirez testified that the harassment started "for reasons unknown" (Filing 46, Ramirez 2005 deposition, at 15:2) and included an incident in February 2001 when Ritterbush staged an accident with a mail cart and complained to a supervisor that Ramirez had tried to run her down, an incident about a month later when Ritterbush pushed a mail cart into Ramirez's path, and an incident when Ritterbush knocked some mail trays off a table that was next to Ramirez. (Id., at 15:5-19:12.) There is no evidence that any disparaging remarks were made. Nor does it even appear that Ramirez was singled out for mistreatment by Ritterbush. He testified that Ritterbush had a reputation as being the "plant bully," that "she had difficulty getting along with everyone there," and that "nobody wanted anything to do with her based on her conduct and the way she treated other people and her [lack of] work ethics." (Id., at 46:13-14; 99:20-100:3.)

In order to establish a prima facie case of racial discrimination, Ramirez must show that he (1) was a member of a protected group, (2) was meeting the legitimate expectations of his employer, (3) suffered an adverse employment action, and (4) that similarly situated employees, who are not members of the protected group were treated differently. See Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000). If this prima facie case is made out, the burden then shifts to the employer to identify a legitimate reason for the adverse employment action. Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). The burden then shifts back to the employee to show that the articulated reason was a pretext. Id.

Ramirez makes no attempt to show that his January 1998 suspension was racially motivated.[16] Ramirez was not disciplined as a result of Ritterbush's complaint in February 2001 that he had attempted to run her down. (Filing 46,

---

[16] A claim of discrimination stemming from the January 1998 suspension would appear to be time-barred in any event. Ramirez testified that he did not complain to an EEO counselor about the January 1998 suspension until a year or so later. (Filing 46, Ramirez 2005 deposition, at 14:12-17.)

12

Ramirez 2005 deposition, at 15:22-16:8.) Although disciplinary action was recommended for the poster incident on May 7, 2001, Ramirez testified that it "[n]ever got that far because of the incident on the 23rd of August." (Id., at 28:9-10.)

Ramirez's suspension on August 23, 2001, was an adverse employment action, presumably, and Ramirez testified that other employees, including Ritterbush, had shot rubber bands at people without being subjected to discipline. The evidence does not indicate that such horseplay was ever reported, or that the same supervisor was on duty. Moreover, Ramirez had words with his supervisor about being summoned to her office for the rubber band incident, and after leaving the office he sought out Ritterbush for having reported him. It was only after these two encounters that he was placed on suspension.

According to Ramirez, he was summoned by Gayle Nelson, the acting Manager of Distribution Operations (MDO). When he arrived at her office she asked him to sit down, but he declined. (Filing 46, Ramirez 2002 deposition, at 6:9-7:8.) When informed why he was there, Ramirez said "You've got to be kidding!" and demanded that a union steward be present. A union steward, Roxie Kotschwar, was then summoned. Ramirez states that he "suddenly felt that [he] was being 'set up' and became disgusted at how ridiculous and trivial this whole matter was" because he knew that Nelson and Ritterbush were friends and was convinced that Kotschwar "would go to great lengths to protect" Ritterbush. (Filing 53, Exhibit 9.) Ramirez then leaned over Nelson's desk and asked why she was not doing something about Ritterbush not wearing her ID badge, which was security violation. (Id.) When Nelson did not answer, Ramirez "turned around and left the office." (Id.; Filing 46, Ramirez 2002 deposition, at 8:3-10). Ramirez tried to find the acting floor supervisor, Jonathan Nguyen, in order to report Ritterbush's security violation, but he saw Ritterbush first and approached her. (Ramirez 2002 dep., at 8:12-24.)

Ramirez denies in his brief that there was "any confrontation or act of violence directed towards [Ritterbush]." (Filing 51, p. 2.) His testimony also indicates that

13

when he tried to talk to Ritterbush she ignored him and walked away, and that he only had his voice raised enough to be heard above the machinery. (Filing 46, Ramirez 2002 deposition, at 8:11-11:19.) Ritterbush testified that Ramirez screamed at her and would not leave her alone. (Filing 53, Ritterbush deposition excerpts, at 54:21-55:15). Nguyen, the floor supervisor, testified that Ramirez approached Ritterbush in a "violent way," which caused Nguyen to stand between them and to radio for assistance. (Filing 46, Nguyen deposition, at 14:7-16:12, 25:1-23.) A factual dispute thus exists regarding what transpired immediately before the suspension.[17]

Ramirez has the burden of demonstrating that there were individuals similarly situated in all relevant aspects to him by a preponderance of the evidence. See Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000). "Specifically, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Id. Although there is a factual dispute concerning the exact circumstances that led to Ramirez's suspension on August 23, 2001, he has not identified one non-minority employee (or, for that matter, any other employee) who was reported to Nelson for misconduct and not disciplined. Without such evidence, no inference can be drawn that Ramirez was suspended because he is Hispanic.

Ramirez has likewise failed to identify a "similarly situated" employee with respect to his termination. Ramirez testified that he went to the police station after being suspended on August 23, 2001, and "told the police officer that the incidents were going on at the post office, that [he] had access to weapons, that [he] was having bad thoughts, he didn't want to be anywhere near or around them and that [he] needed

---

[17] The administrative judge found that Ramirez confronted Ritterbush in an antagonistic, threatening manner. (Filing 46, MSPB decision, at p. 8.) That finding is not preclusive, however, because "Congress intended that claims arising under Title VII be afforded a trial de novo." Gergick v. Austin, 997 F.2d 1237, 1238 (8th Cir. 1993) (citation omitted). "Consequently, the doctrine of administrative estoppel is inapplicable to Title VII claims." Id.

help." (Filing 46, Ramirez 2005 deposition, at 69:15-20.) It also is undisputed that Ramirez disclosed to mental health counselors that he had thoughts of harming four Postal Service employees, which caused Tarasoff[18] warning letters to be sent to the employees. No other employee is shown to have posed such a threat.

The closest example provided concerns an employee named Tan Vu, who reportedly said at one time that he "should chop supervisors heads off and put them on stakes out in front of the building." (Filing 53, affidavit of Jeanne Long, ¶ 11; Filing 57, deposition of Carl Bouges, at 48:16-51:21.) It has not been shown that such statement was made under circumstances that were comparable to Ramirez's situation. In any event, Tan Vu is Vietnamese. (Id.) The relevant protected group for purposes of analyzing Ramirez's discrimination claim is not limited to Hispanics, but, rather, it includes all racial minorities. That is, he must show that similarly situated white employees were not terminated. See, e.g., Hervey v. City of Little Rock, 787 F.2d 1223, 1231 (8th Cir. 1986) (in a disparate treatment case, minority plaintiff must basically prove that the defendant treated him less favorably than similarly situated non-minority employees in circumstances from which intentional discrimination can be inferred). This Ramirez has failed to do.

Even if Ramirez could make out a prima facie case of discrimination, the Postal Service had a legitimate, nondiscriminatory reason for firing him. "Both actual violence against fellow employees and threats of violence are legitimate reasons for terminating an employee." Id., 218 F.3d at 919 (citing Ward v. Procter & Gamble Paper Prods., Co., 111 F.3d 558, 560 (8th Cir. 1996). In this regard, it is especially noteworthy that the USPS has a zero tolerance policy. See Sherman v. Runyon, 235 F.3d 406, 409 (8th Cir. 2000).

---

[18] Tarasoff v. Regents of University of California, 551 P.2d 334 (Cal. 1976) (holding that when a therapist determines that a patient presents a serious danger of violence to another, the therapist has an obligation to use reasonable care to protect the intended victim against such danger).

15

Ramirez's violation of the zero tolerance policy also dooms his retaliation claim. To demonstrate retaliation, Ramirez must make a prima facie showing that: (1) he engaged in statutorily protected conduct; (2) there was an adverse employment action; and (3) a causal connection exists between his conduct and the adverse action. Sallis v. University of Minnesota, 408 F.3d 470, 477 (8th Cir. 2005). "The timing of a plaintiff's discharge in relation to his protected activity can sometimes establish causation for the purpose of establishing a prima facie case. However, timing on its own is usually not sufficient to show that an employer's non-discriminatory reason for discharge is merely pretext. Instead, the timing of the discharge is usually evaluated in light of other evidence, or lack of other evidence, in the record." Sherman v. Runyon, 235 F.3d 406, 410 (8th Cir. 2000). The mere fact that Ramirez was given notice of his proposed termination twelve days after filing a second EEO complaint[19] is not sufficient to establish that the grounds for dismissal cited in the notice—including some matters that were the subject of the EEO complaint—were pretextual. See Smith v. Allen Health Systems, Inc., 302 F.3d 827, 834 (8th Cir. 2002) ("Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity.").

In summary, Ramirez cannot establish a prima facie case of a hostile work environment, of disparate treatment concerning his suspension and termination, or of retaliation. Also, the Postal Service has provided legitimate, nondiscriminatory reasons for the termination, and Ramirez has failed to present evidence sufficient to create an inference of pretext. All of his Title VII claims therefore fail.

---

[19] Following the August 23, 2001 suspension and until the termination became effective on January 7, 2002, Ramirez was on paid leave. (Filing 46, Ramirez 2002 deposition, at 25:17-20.) His EEO counseling ended on October 20, 2001, and the EEO complaint was filed on November 9, 2001. The notice of proposed removal was issued on November 21, 2001.

## B. First Amendment Claim

Ramirez alleges for his "second cause of action (freedom of speech)" that he was terminated "because of the complaints about discrimination the Plaintiff had previously made and because of statements made by Plaintiff in seeking help for his depression." (Complaint ¶ 21.)[20] Insofar as Ramirez alleges that he was terminated for complaining about discrimination, his constitutional claim is no different than his Title VII retaliation claim. Title VII, however, "provides the exclusive judicial remedy for claims of discrimination in federal employment." Brown v. General Services Administration, 425 U.S. 820, 835 (1976).

With respect to the remainder of the claim, Ramirez must prove (1) that he engaged in a protected activity; (2) that the employer took an adverse employment action against him; and (3) that the two situations are causally connected. See Ohruhlik v. University of Arkansas, 395 F.3d 872, 878 (8th Cir. 2005). There is no question that Ramirez was fired because of the statements against interest that he made to the police and to the mental health counselors. The first essential element is lacking, however, because Ramirez's statements concerned a personal matter, not a matter of public concern. See de Llano v. Berglund, 282 F.3d 1031, 1036 (8th Cir. 2002) (defining "protected speech" and holding that an inquiry into whether the employee's speech can be characterized as a speech about a matter of public concern is a question of law for the court to decide). It is commendable that Ramirez reported himself to police and confided to the mental health counselors his "bad thoughts" about causing harm to specific individuals, but the statements were made because Ramirez was seeking help for his own problems with anger and depression.

---

[20] Although Ramirez alleges that all of his constitutional claims are brought pursuant to 42 U.S.C. § 1983, that statute only applies to state actors. See Jones v. United States, 16 F.3d 979, 981 (8th Cir. 1994) (§ 1983 is inapplicable when a person acts under authority of federal law).

### C. Equal Protection Claim

Ramirez states in his brief that he "voluntarily dismisses the claim that was made under the Equal Protection Clause pursuant to the decision in Brown v. General Services Administration, 425 U.S. 820 (1976)." (Filing 51, p. 31.) The court construes this "voluntary dismissal" as a concession that summary judgment should be entered on this claim because Title VII provides the exclusive remedy.

### D. Due Process Claim

Finally, Ramirez alleges for his "fourth cause of action (due process)" that "actions of the individual Defendants in depriving Plaintiff of his employment under false pretenses and for illegal, arbitrary and capricious reasons violates Plaintiff's rights to due process as secured to him by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983." (Complaint ¶ 28.) Even if this due process claim is treated as arising under the Fifth Amendment,[21] it appears to be no different than Ramirez's Title VII claim that the reasons given for his termination were a pretext for discrimination and retaliation. As such, it cannot be maintained.

### III. CONCLUSION

It should be remembered that the issue in this case is whether Ramirez was subjected to unlawful discrimination or retaliation, and not whether he was treated fairly by the Postal Service. The "fairness" issue, at least insofar as his termination was concerned, was examined by the administrative judge for the MSPB, and her decision affirming the termination was not appealed to this court. Because Ramirez

---

[21] The commands of the Fourteenth Amendment are addressed only to the states and to those acting under color of state authority; the actions of the federal government and its officers are beyond the purview of the amendment. District of Columbia v. Carter, 409 U.S. 418, 423-24 (1973).

18

has not produced sufficient evidence to support his claims of unlawful discrimination and retaliation, the action must be dismissed.

    IT IS ORDERED that:

1. Plaintiff's motion for leave to file supplemental index of evidence (filing 61) is granted <u>instanter</u>.

2. Defendant's motion for summary judgment (filing 44) is granted.

3. Judgment shall be entered by separate document.

July 28, 2005.                      BY THE COURT:

                                          s/ *Richard G. Kopf*
                                          United States District Judge